HOLLAND (KNOWLTON v.). See Case No. 7,904.

HOLLAND (POTTER v.). See Cases Nos. 11,329 and 11,330.

HOLLAND (SWAIN v.). See Case No. 13,661.

HOLLAND (UNITED STATES v.). See Cases Nos. 15,377 and 15,378.

## Case No. 6,607.

### HOLLEMAN v. DEWEY.

[2 Hughes, 341;[1] 7 N. B. R. 269.]

District Court, D. North Carolina. 1872.

PAYMENT—PROOF OF DEBTS — ILLEGAL CONTRACT —CONFEDERATE BONDS.

The plaintiff, at various times prior to and on the 16th day of June, 1862, had made deposits with the Bank of North Carolina. On the 30th day of March, 1864, his account with the bank was made up, and the sum of $5253.69 ascertained to be due to him. On that day Holleman drew and delivered to the bank his check, in the usual form, for the full sum due to him, and accepted in part payment for the check five coupon bonds, issued by the state of North Carolina, on the 1st day of January, 1863, which were issued in aid of the Rebellion. *Held*, that such bonds, when accepted by a creditor in payment of his debt, and while they are of value as a medium in the money markets, constitute a valid medium for the payment of a debt, provided the contract or engagement in which they are used was not a contract made in aid of the Rebellion.

[See Bailey v. Milner, Case No. 740.]

Petition to expunge proof of debt.

BROOKS, District Judge. From the deposition of William H. Holleman, filed under the 11th section of the bankrupt act [of 1867 (14 Stat. 521)], the application of Charles Dewey, assignee of the Bank of North Carolina, filed under the provisions of the same section, and the answer of the said Holleman to the allegations contained in the application of the assignee, it sufficiently appears that said Holleman was a creditor of said bank by a deposit account, commencing on the 31st day of October, 1859; that the

last deposit made by Holleman was on the 16th day of June, 1862; that on the 30th day of March, 1864, the accounts were made up, and there was ascertained to be due from the bank to Holleman the sum of $5253.69, and on that day Holleman drew his check, payable to himself, for that sum, which was delivered to the bank, and which, being charged, balanced his account with the bank. It further appears that for the check mentioned five North Carolina state coupon bonds for $1000 each, issued on the 1st day of January, 1863, were transferred and delivered by the bank to Holleman. The bonds so delivered are filed, and it appears that each bears the words "Confederate States of America" at its head, and are made redeemable at the treasury of the state of North Carolina, in good and lawful money of the Confederate States, on the 1st day of January, 1893. These bonds are payable to the Bank of North Carolina or bearer, and on each appears the following indorsements:

"Treasury Department, North Carolina, September 3d, 1863. This bond is the property of the Bank of North Carolina, and is transferable only at this office by written indorsement on the bond, witnessed by the public treasurer. (Signed), Jno. Worth, Pub. Treasurer. December 11th, 1863.

"I hereby assign and transfer the within bond to bearer. (Signed), C. Dewey, Cashier, Bank of North Carolina."

"Treasury Department of North Carolina, March 3d, 1865. This bond is the property of W. H. Holleman, and is transferable only at this office by written indorsement on the bond witnessed by the public treasurer or his chief clerk. (Signed), P. A. Wiley, Chief Clerk."

The coupons representing the accrued interest from the 1st day of January, 1863, to the 1st day of January, 1864, were detached, and the bonds, with the remaining coupons, as the evidence shows, were delivered to Holleman, at the estimated value of $1000 each, at the same time that he executed and delivered to the bank his check. It is not shown in what way the balance, say two hundred and fifty-three dollars and sixty-nine cents, was paid, and as to that sum there is no controversy between the parties. These bonds purport, on their face, to have been issued under the authority of an act of the general assembly, entitled "An act to provide ways and means for supplying the treasury," passed 20th December, 1862. On the application of the assignee, and under the order of this court, several witnesses have been examined, all of whom were officers of the bank at the time these bonds were transferred, and of whom, if it were not otherwise known that they are gentlemen of the first order of respectability and intelligence, these depositions on file in this case would clearly indicate such to be their character. Much of the evidence of these witnesses has been excepted to by the counsel for Holleman;

[1] [Reported by Hon. Robert W. Hughes. District Judge, and here reprinted by permission.]

but, in the opinion of this court, it is not necessary to notice these exceptions, further than to say that, in arriving at the conclusions which I have upon the questions presented, I have attached no importance whatever to the portions of those depositions to which these exceptions relate.

Upon this statement of facts the counsel for Mr. Holleman insists that the deposition filed by him should be held to be proof of his debt against the estate of the bank in the hands of the assignee, to the extent of five thousand dollars and the coupons attached, and which were due at the time of the filing the deposition, and for the following reasons: First. They say that Holleman did not receive the bonds in payment of his debt, but only as a security for the future payment of the same. Second. That it being established that there was, on the 30th day of March, 1864, and long before that day, a bona fide debt due from the bank to him, equal to the sum now claimed; that such debt could not be liquidated and discharged by the payment or delivery of the bonds described; that, being issued in aid of the Rebellion, they were void, and could not constitute a valid medium or consideration for the discharge of a debt. Thirdly. That, if the bonds were in fact delivered and accepted in payment of the deposit account due to him, and though they constituted a valid medium for the payment of such a debt, he still had a right to prove these bonds, with the matured coupons attached, as a debt against the bank, which that corporation had become bound in law to pay to him, by reason of the indorsement placed upon these bonds by the cashier; that, by the indorsement referred to, the same liabilities were incurred on the part of the bank, and the same rights accrued to him, or any subsequent holder, as would have arisen out of any indorsement for value of any commercial paper or ordinary bond, without the use of any qualifying word.

I will examine these objections in the order in which they are stated.

It is true Holleman avers in his deposition which he filed as a proof of debt, and also in his answer filed to the petition of the assignee in this case, that the bonds were not delivered to him nor received by him in payment of his debt, but only as security for the payment of that debt. Without adverting to the depositions of any of the witnesses examined, there are two facts, established beyond all doubt, which renders this question not even doubtful or difficult of settlement. The first of these is the fact that at the time he received the bonds from the bank he executed his check, covering the full amount of the debt due to him—not more or less—without any word qualifying or restricting it, thereby allowing to the check the full effect of an unconditional receipt. Then I conclude that he was a man of ordinary business capacity at least, which was quite sufficient to enable him to understand the effect of his unqualified receipt. It would be going too far to say that he trusted to some unwritten promise made to him, or, indeed, to say that there was any such promise made to him, for he was well aware that his dealings were with "a soulless corporation," whose officers of to-day (though they may be men of the highest character and worthy of all confidence) may yet not be officers to-morrow, and then any promise or agreement would be worth its legal effect only. Then, as if to leave no room for doubt, Holleman took these bonds to the treasury office, nearly twelve months after he had received them—on the 3d of March 1865—and caused to be indorsed thereon by the treasurer an acknowledgment that the bonds were 'his property, and this indorsement is also without condition or qualification. The results of this transaction show that Mr. Holleman exchanged the lesser for the greater risk, but in this he only followed in the footsteps of thousands of those who were regarded the best financiers in the Southern states. It is unquestionably true, I think, that he accepted the bonds in payment of his claim, and he did so believing that they were more valuable than his debt, or that he could realize for them more advantageously than he could for his claim.

The second objection taken by counsel against the application of the assignee is one which I regard as having been well settled by the supreme court of North Carolina as well as by the courts of the United States. In the case of Kingsbury v. Lyon, 64 N. C. 128, the supreme court of North Carolina say: "In ordinary dealings, during the late war, without design to aid the Rebellion, Confederate treasury notes were a sufficient consideration to support a contract." In the later case of Haughton v. Merony, 65 N. C. 124, the same court goes a step farther, and declares that a bond given in March, 1864, for Confederate money borrowed and payable in Confederate bonds or Confederate currency, is not illegal or void, and a recovery may be had upon it. Referring to the first case in that court in which the question was presented, we find this language: "The question whether a contract in which Confederate treasury notes or currency was the consideration, would be enforced, came before this court at June term, 1867, in the case of Phillips v. Hooker, Phil. Eq. 193. The case was considered with great care, and it was held, upon reasons which appear to us solid, that such a contract was not illegal. The principle of this case has since then been repeatedly approved, and we consider that it is not now an open question." The federal authorities are to the same effect—that Confederate money during the Rebellion was a valuable consideration, and sufficient to uphold a contract, when the contract was not in aid of the Rebellion; and it has been repeatedly decided that Confed-

erate money was a valid medium for the payment and satisfaction of a bona fide debt, when accepted by the creditor as such. But it may be suggested that there is a distinction between Confederate currency or money and Confederate bonds, or the bonds of a state issued while such state was in rebellion, and in aid of the Rebellion. I think it might be conceded that these bonds were issued for the purpose of aiding the state of North Carolina in her resistance to the laws and authority of the United States, and yet a payment in such bonds would not be more within the principles governing contracts, contra bonos mores, than if the payment had been in Confederate States money. In the case of Haughton v. Merony, before referred to, that was relied on to distinguish that case from those previously decided by that court. The defendant, Merony, had on the 3d of March, 1864, for Confederate treasury notes received from the plaintiff, Haughton, engaged to pay to Haughton, on demand, the like sum in four per cent. Confederate bonds or certificates, or in Confederate currency, to be issued after the 1st day of April, 1864. Mr. Justice Rodman, in delivering the opinion of the court, says: "We cannot perceive any substantial distinction. The only difference between the treasury notes and the bonds was that the latter bear interest and the former did not. Both were payable on the ratification of a treaty of peace between the United States and the Confederate States. Both were issued by the Confederate government for the purpose of aiding it to carry on the war, and they must stand on the same footing as subjects of traffic." If the learned judge was correct in his opinion delivered in that case, it will scarcely be insisted that the bonds in question were more void or of less value at any time after they were issued than either Confederate money or Confederate bonds. But, on the contrary, it is well known that North Carolina bonds of the character of these possessed a value in the markets for some months after Confederate securities, both money and bonds, were entirely valueless, and if, in law, Confederate money or bonds can be held to be a sufficient consideration to support a contract, it must of necessity follow that either will be sufficient to liquidate and discharge a contract or debt, while they retain a value in the business transactions of the country, and when either has been accepted in payment by a creditor.

Then it remains to be considered whether there was incurred by the bank, by the indorsement or transfer made by its cashier on these bonds, an obligation to pay the same, or make them good to the holder in case of failure or inability on the part of the state to pay them. Now, it may be that these bonds could have been indorsed or transferred by the bank in such form as to have made the bank responsible directly as indorser or guarantor upon the contingencies

mentioned. But it is quite clear, I think, that no such obligation was incurred by the bank, by reason of the indorsement made upon these bonds, and no such liability was understood to be incurred either by the bank or Mr. Holleman. In the first place, the bonds transferred were such as are termed "public securities," and ordinarily are sold and delivered in the markets, and the title to which passes by delivery—they are ordinarily payable to bearer—and such was the character of the first bonds issued by North Carolina, while there were some advantages to the holders of these bonds, arising from the facility with which they could be sold and their value realized. Yet there were losses to which the owners were subjected, by accident to the bonds; and to protect the bona fide holder against such loss by accident, it was provided, by an act of the general assembly of North Carolina, passed the 8th day of January, 1857 [Acts N. C. 1856, 1857, p. 17]: "That holders of coupon bonds of the state may bring them to the public treasurer, who, in such case, shall be required to register the name of the said holders in a book kept for that purpose, together with the number, amount, and date of the bonds, and shall also indorse on such bonds that they are transferable only at his office, by written indorsements on the bonds, witnessed by him." By the second section of that act the treasurer is required: "To witness such indorsements, and to register the names of the persons to whom indorsed, and the date of the indorsement." And by the third section it is further provided: "That the registry of said bonds shall be received as evidence of their existence, amounts, and when due and payable, in all cases when the original is lost or destroyed." We then find that the bonds in question had been issued and were made payable to the Bank of North Carolina; that the indorsements authorized to be made by that act were made by the treasurer; so that in no way could the property in these bonds have been transferred to Mr. Holleman but by conforming to the plain requirements of the act. It is, moreover, seen that the transfer made by Mr. Dewey, as cashier, was not made at the time the bonds were delivered to Mr. Holleman, if the transfers were truly dated, for these are dated 11th December, 1863, and are made "to bearer."

It is well known that, when a government or a corporation undertakes to effect a loan upon securities of the character of these, it is always a leading purpose on the part of such government or corporation to render such obligations transferable from holder to holder, with the least inconvenience consistent with the safety of the holder, from loss by accident, and without any responsibility on the part of the party transferring, respecting the ultimate payment of the same; and this, because it tends in the highest degree to appreciate their value in the mar-

kets, and in large transactions bonds are often made to answer the purposes of money. What, then, would more surely defeat that desirable object than to forbid the sale or transfer of such bonds, unless upon such terms as would hold the party transferring as security against the ultimate insolvency of the makers? I regard it as entirely clear that by the transfer made on these bonds it was only intended to pass the title in the same to such persons as they might be delivered to, and that this was its only legal effect. This is the view entertained by this court on this point, and without reference to the deposition of either of the three former officers of the bank who were examined, but on the case as disclosed by the application filed by the assignee, the answer of Mr. Holleman, and the bonds and other exhibits filed in the case.

Upon the last question presented in this case, I have examined the elaborate argument submitted by Mr. Haywood, and the numerous authorities cited by him, with even more than my usual care, but have now to confess that I have arrived at a different conclusion from that so ably presented by him.

And now, at Raleigh, in said district, on the —— day of ——, 1872, upon the pleadings and evidence submitted to the court upon the claim of William H. Holleman against the estate of the Bank of North Carolina, it is ordered that said claim be disallowed and expunged from the list of claims upon the assignee's record in said case. Let this be certified to A. W. Shaffer, register.